UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA    :
                            :
   v.                       :    1:14-MJ-079PAS
                            :
GLADYS PENA                 :

**MEMORANDUM AND ORDER**

Defendant Gladys Pena is charged by criminal complaint with possession with intent to distribute more than one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), as well as conspiracy to distribute more than one kilogram of heroin in violation of 21 U.S.C. § 846. Arrested at the same time and also charged by criminal complaint with the same offenses is Defendant Joan Nunez, alleged by the government to be Pena's co-conspirator. On April 9-10, 2014, Defendants Pena and Nunez appeared before this Court for a preliminary hearing pursuant to Fed. R. Crim. P. 5.1. Both were represented by counsel. At the conclusion of the hearing, the Court found that the government had established probable cause as to both charges against Nunez and as to the charge of conspiracy to distribute more than one kilogram of heroin as to Pena. However, the government's probable cause presentation established that Pena had constructive possession (based on evidence permitting the inference that she knowingly had the power and intent to exercise dominion and control)[1] over only 620.9 grams of heroin. The balance of the heroin (more than two kilograms) was within the constructive possession of her co-conspirator, Nunez.

---

[1] See United States v. Howard, 687 F.3d 13, 19-20 (1st Cir. 2012) (when drugs or gun not found on defendant's person, government may establish element of possession through proof of constructive possession, which "exists when a person knowingly has the power and intention at a given time to exercise dominion and control over an object") (citing United States v Hicks, 575 F.3d 130, 139 (1st Cir. 2009)).

In light of these facts, the Court asked for further briefing, from the government and from Pena, regarding whether probable cause establishing that she participated in the conspiracy to distribute more than one kilogram of heroin necessarily establishes probable cause for the separate offense of possession, despite the lack of evidence that she exercised dominion or control over more than 620.9 grams of heroin. For the reasons stated below, I now find that the government has sustained its burden of establishing probable cause as to Pena with respect to the charge of possession with intent to distribute more than one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

## DISCUSSION

### Preliminary Hearing Standard

The government's burden to establish probable cause at this preliminary stage is low. A preliminary hearing under Fed. R. Crim. P. 5.1 is narrow in scope. Its purpose is solely to test whether probable cause exists as to the offense charged. It is not a discovery mechanism for defendants, and is not a trial to determine guilt or innocence. Although mere suspicion does not suffice, probable cause may be found where there is a "fair probability," based on the totality of the circumstances, that a defendant committed the offense charged. United States v. Mims, 812 F.2d 1068, 1072 (8th Cir. 1987) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)); see United States v. Gomez, 716 F.3d 1, 7 (1st Cir. 2013). As the Supreme Court has counselled, probable cause is a "fluid concept," turning on the evaluation of evidence in a "nontechnical, common-sense manner." Gates, 462 U.S. at 232, 235-36. Both circumstantial evidence and the reasonable inferences drawn from it can support a finding of probable cause. United States v. Swope, 542 F.3d 609, 616 (8th Cir. 2008); United States v. Hilario, CR No. 1:09-M-167A, 2009 WL 2913957, at *1 (D.R.I. Sept. 9, 2009). With the exception of the rules on privilege, the

Federal Rules of Evidence are not applicable at preliminary hearings. Fed. R. Evid. 1101(d)(3). As a result, the probable cause finding may be based, in whole or in part, on hearsay evidence. Evidence at the preliminary hearing is not subject to objection on grounds that it was unlawfully acquired.[2] Fed. R. Crim. P. 5.1(e).

**Probable Cause Evidence**

The government's probable cause evidence included sworn testimony from Detective Martin Hames of the Providence Police Department, a sworn affidavit from Task Force Officer Juan Robles of the Drug Enforcement Administration and photographs of the seized evidence that demonstrated, *inter alia*, the similarity of the packaging paraphernalia used by the conspirators at two of the locations searched by law enforcement. In addition, Pena's counsel presented testimony from Providence Police Detective Thomas Zincone, together with an affidavit in support of a search warrant application, a Police Incident Report and a statement by Detective Hames, all prepared in connection with this investigation. I found the testimony of both police officers extremely clear and highly credible.

The investigation that resulted in the arrests of Pena and Nunez was originally targeted on Nunez only. A reliable confidential informant told law enforcement that Nunez was engaged in heroin trafficking, storing the proceeds of the trafficking at a house located at 105 Mitchell Street in Providence ("Mitchell Street"), while his stash of heroin was stored at 142-144 Superior Street in Providence ("Superior Street"). Two controlled buys confirmed this information: law enforcement observed Nunez as he left Mitchell Street, drove in a maroon van to Superior Street, and immediately from there to the location of the heroin transaction. After Mitchell Street and Superior Street were placed under surveillance, police again observed Nunez leave Mitchell

---

[2] Pena argued that the government failed to establish probable cause because the various searches that resulted in the evidence on which the government relies violated her constitutional rights. Because inadmissible evidence is appropriate for consideration at the probable cause phase, I disregard these arguments.

Street, drive to Superior Street, and proceed from there to a meeting with another male to whom he sold heroin. The other party to that transaction was immediately arrested – he confirmed that he had just purchased the heroin found on his person. Specifically, police seized a box inside his waistline containing sixteen blue bundles, each of which contained fifty blue glassine bags of heroin, a total of 192.4 grams. The buyer had paid $1500 for the heroin; police found $1613 on Nunez when he was arrested as he drove away from the heroin sale location.

As of this point in the unfolding drama, investigating officers knew nothing of Pena; her name had never been mentioned by the confidential informant and there was no information whatsoever linking her in any way to Nunez's heroin trafficking.

Immediately after Nunez was arrested, law enforcement continued surveillance while Detective Hames procured a search warrant for Mitchell Street, both the residence and curtilage, as well as for Superior Street. While they waited, police observed a woman later identified as Pena surreptitiously leave the front of Mitchell Street carrying a white trash bag, look up and down the street as if checking to see if she was being watched, and then dash down the driveway towards the trash containers. Detective Zincone testified that he left his car in time to observe through a fence; he saw Pena discarding a white shopping bag into a trash container at the rear of the property. She then returned to the inside of Mitchell Street through the same door that law enforcement had seen Nunez using for each of the three observed heroin transactions. A few minutes later, Pena left Mitchell Street again; this time, she got into a car and tried to back out of the driveway. Officers prevented her from leaving and detained her inside Mitchell Street while the search warrant was executed.

After officers entered Mitchell Street, a one story structure with a basement, they discovered that the entire first floor is a single apartment, with a living room and bedrooms,

4

while there is a separate living area in the basement. A door with at least a latch separated the first floor from the basement. The evidence permits the inference that Pena lived in the first floor unit while Nunez occupied the basement. The evidence also established that Pena lived at Mitchell Street with her female partner, while Nunez is her partner's brother.

In Nunez's basement living area at Mitchell Street, officers found drug trafficking paraphernalia sufficient to permit the inference that the trafficking involved substantial quantities, including two kilo presses, a gas mask and sandwich baggies. In a trash receptacle in the basement, they found discarded opened and empty cardboard boxes. Also significant was the discovery of a glass jar containing 890 blue glassine bags, each containing a small quantity of heroin. In total, detectives seized 471.9 grams of heroin from the basement of Mitchell Street.

The search at Superior Street, the building visited by Nunez immediately prior to each of the observed heroin sales, also turned up heroin and evidence of trafficking. At the time of Nunez's arrest, in his pocket, police had found keys that opened both the outer door and the door to an interior room at Superior Street. In the interior room, officers found a white grinder with heroin residue, an opened brown box filled with empty blue glassine bags, a total of 1,200 blue glassine bags each packed with a small amount of heroin, a digital scale, plastic shrink wrap, a bag of rice containing wrapped bags of heroin, three silver weights and five clear plastic bags of heroin. In all, detectives seized a total of 1691.7 grams of heroin from Superior Street.

Evidence directly linking Pena to the conspiracy was found in the first floor unit of Mitchell Street, much of it in a bedroom where officers found personal documents belonging to Pena. In the two closets, police found a pistol registered to Pena (corroborating the proof that the closets were her personal space), a box loaded with twenty-three neatly stacked brown cardboard

boxes, each filled with empty blue glassine bags, and a backpack[3] filled with eight more brown cardboard boxes filled with the same empty blue glassine bags.  Based on the photographic evidence, these brown cardboard boxes and empty blue glassine bags appear identical to the empty brown boxes and the blue glassine bags packed with heroin found in the basement of Mitchell Street and the brown box and the blue glassine bags packed with heroin found in the locked room at Superior Street.  The testimony established that they were also similar in appearance to the blue glassine bags that had been used to package the 192.4 grams of heroin that Nunez sold at the time he was arrested.  Overall, the large quantity of neatly packed empty blue glassine bags stored in Pena's bedroom closet is a clear link to the hundreds of blue glassine bags packed with heroin found in the basement of Mitchell Street, in the locked room at Superior Street and in the box found in the waistline of Nunez's buyer, permitting the inference that Pena was knowingly storing the paraphernalia to be used in a conspiracy to distribute a large amount of heroin.

Other evidence linking Pena to the conspiracy – and establishing that it was foreseeable to her that the conspiracy involved distribution of large quantities of heroin – was found in the white trash bag that Pena had surreptitiously tried to discard shortly after Nunez was arrested and before she was aware of a search warrant for Mitchell Street.  In that bag, officers found 168.2 grams of heroin and two grinders, one with heroin residue and one that had been washed.  Also found at Mitchell Street and linking Pena to the conspiracy was the maroon van, which was registered to Pena's father but had been used by Nunez for each of the three heroin transactions observed by law enforcement.  Finally, consistent with the information provided by the confidential informant that Mitchell Street was where the trafficking proceeds were kept, in a

---

[3] The affidavit in support of the criminal complaint states, "[f]rom a dresser drawer, detectives seized . . . a red backpack containing eight cardboard boxes of empty blue glassine baggies," ECF No. 1 at 7; however, Detective Hames testified definitively that this backpack was found in Pena's bedroom closet.

6

safe on the first floor of Mitchell Street (in the unit occupied by Pena, though not in her bedroom), officers found $15,000, while in her purse they found $3,000.

After Pena's arrest and detention, the confidential informant came forward with new information – s/he advised law enforcement that Pena was storing a kilogram of heroin at a business that she owned and operated on Manton Avenue and that someone would be trying to remove the heroin from that site. Pena's Manton Avenue store was placed under surveillance. Two days after Pena's arrest, officers procured a search warrant for the Manton Avenue store; the search resulted in the discovery of both drug trafficking paraphernalia and heroin. Specifically, in the bathroom ceiling, officers found a scale and a knife with residue of heroin while behind the door of the bathroom a black T-shirt was found with 452.7 grams of heroin.

In all, the heroin over which the evidence establishes that Pena had constructive possession included the 168.2 grams found in the white trash bag that she attempted to discard at Mitchell Street and the 452.7 grams found at her Manton Avenue store, a total of 620.9 grams. The balance of the heroin was located at Superior Street (1691.7 grams), in the basement of Mitchell Street (471.9 grams) and in the stash sold by Nunez just before he was arrested (192.4 grams). As to that heroin, a total of 2,356 grams, there is no direct evidence that Pena ever had possession or control over it, nor is there evidence of direct interaction between Pena and Nunez with regard to heroin trafficking.

Based on this quantum of proof, the Court found that the government had more than satisfied its burden of demonstrating possession by Nunez of more than a kilogram of heroin and of the existence of a common enterprise between Nunez and Pena to distribute the heroin found in the possession of each of them, which cumulatively well exceeds one kilogram. However, apart from her participation in the conspiracy, there is no evidence that Pena knowingly had the

7

power and intention to exercise dominion and control over the heroin located at Superior Street, in the basement of Mitchell Street or what was seized from the heroin sale that resulted in Nunez's arrest.

**Legal Analysis**

Since the seminal decision of the United States Supreme Court in Pinkerton v. United States, 328 U.S. 640 (1946), it has been well settled that a co-conspirator is responsible not only for her own acts, but also for the reasonably foreseeable acts of other conspirators done in furtherance of the conspiracy. Id. at 647-48. If an overt act constitutes a substantive offense, such as possession of a controlled substance, the actor's co-conspirators are criminally liable for the overt act and for the substantive offense which it constitutes. Id. at 646-47. The linchpin is "reasonable foreseeability." United States v. Bucci, 525 F.3d 116, 132 (1st Cir. 2008) (defendant liable for section 924(c) violation despite lack of knowledge that co-conspirator would use firearm because it was reasonably foreseeable).

In this Circuit, to establish the offense of drug possession in a case based on a drug trafficking conspiracy, it is well settled that the government must establish either direct or constructive possession of the drugs or possession by a co-conspirator during a time when the defendant and that co-conspirator were members of the conspiracy, coupled with proof that the co-conspirator's possession was in furtherance of the conspiracy and was reasonably foreseeable by the defendant as a natural outgrowth of the conspiracy. United States v. Diaz, 670 F.3d 332, 343 (1st Cir. 2012). The Court acknowledged that Diaz was a "very close case," but affirmed the jury verdict convicting the defendant on the count of possession with intent to distribute crack cocaine based on evidence of crack in the possession of a co-conspirator after the defendant had ratified his participation in the conspiracy; based on a Pinkerton instruction, the Court held that

8

the jury could have found that the co-conspirator's possession was reasonably foreseeable to the defendant and committed in furtherance of the conspiracy. Id.

In other circuits, convictions have been upheld in similar circumstances, that is, where the court finds no evidence of direct or constructive possession by the defendant, yet upholds the conviction for possession based on reasonably foreseeable possession by a co-conspirator. See, e.g., United States v. Hayes, 391 F.3d 958, 963 (8th Cir. 2004) (despite insufficient evidence of actual or constructive possession by defendant of crack cocaine found in possession of co-conspirator, conspiracy evidence, coupled with evidence of reasonable foreseeability, results in affirmation of conviction for possession); United States v. Shults, 68 F. App'x 648, 654 (6th Cir. 2003) (constructive possession is attributable to co-conspirators as long as it is reasonably foreseeable to defendant that his co-conspirator was in possession of gun); United States v. Diaz-Garcia, 931 F.2d 61, at *3 (9th Cir. 1991) (unpublished table decision) (defendant's conviction for possession of more than 100 grams of heroin affirmed based on co-conspirator's possession of 50.1 grams and intent to retrieve 74.1 additional grams); but see United States v. Innamorati, 996 F.2d 456, 470-41 (1st Cir. 1993) (where government produced insufficient evidence to demonstrate possession by defendant of cocaine found at both locations controlled by co-conspirator, conviction for possession of cocaine seized at one location reversed). Thus, as long as the critical element of "reasonable foreseeability" is present, possession may be established by evidence of possession by a co-conspirator. See Comment, A Common Law Crime Analysis of *Pinkerton v. United States*: Sixty Years of Impermissible Judicially-Created Criminal Liability, 67 Mont. L. Rev. 89, 99 (Winter 2006). This conclusion is consistent with the Supreme Court's recent reaffirmation of the importance of foreknowledge as an element of criminal behavior. See

Rosemond v. United States, 134 S. Ct. 1240, 1252 (2014) (924(c) liability requires proof of foreknowledge of cohort's use of firearm).

The government's evidence is more than sufficient to establish that Pena could reasonably foresee that her co-conspirator Nunez, in furtherance of the conspiracy, was in possession of more than one kilogram of heroin. The significant amount of empty packaging paraphernalia (brown cardboard boxes filled with empty blue glassine bags) found in her bedroom, consistent with the materials used to package the heroin found in the basement of Mitchell Street, at Superior Street and at the sale when Nunez was arrested, permits the inference of participation in a conspiracy to process for wholesale or retail trafficking a substantial amount of heroin and specifically links Pena to the heroin found in Nunez's possession. Further, her attempt to surreptitiously discard two grinders confirms that she was aware of, and trying to cover up, a conspiracy to process more than just the heroin that she discarded at the same time. Mindful that this is the probable cause stage where the government's burden is simply to establish a fair probability based on the totality of the circumstances, this evidence is enough to prove that there is probable cause to charge Pena with possession with intent to distribute more than one kilogram of heroin.

Pena argues that there is no probable cause because the evidence establishes that she was merely present at the location of the criminal activity, did not exercise dominion and control over the narcotics, lacked guilty knowledge and was not an active or willful participant, citing United States v. Nelson-Rodriguez, 319 F.3d 12, 27-28 (1st Cir. 2003). In effect, she seeks to tap into the cases finding that the innocent roommate did not join the conspiracy. See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause"); see also Wilson v. City of

10

Boston, 421 F.3d 45, 56 (1st Cir. 2005) (where only basis for probable cause is that most other people in the room had warrants for their arrest supported by probable cause, no probable cause for search or arrest of defendant).  Mere presence is insufficient to establish probable cause either for conspiracy or for possession.  United States v. Aponte-Suarez, 905 F.2d 483, 491 (1st Cir. 1990).

This ship has sailed.  The Court has already found that the government sustained its burden with respect to Pena's participation in the conspiracy; indeed, the evidence is more than adequate to clear that probable cause hurdle.  Pena's presence is far from the only evidence against her – for example, her surreptitious behavior in attempting to discard both heroin and trafficking paraphernalia evidences knowledge of the distribution scheme, consciousness of guilt and that she had a stake in the outcome.  When that evidence is linked to her attempt to flee and the paraphernalia, drugs and cash found within her control (in her bedroom, in her apartment unit and at her store), the proof of probable cause for conspiracy is ample.  The fact that this evidence does not rule out that others may also have participated in this conspiracy is beside the point.  The issue now is not whether there is probable cause linking her to the conspiracy but rather whether her participation in the conspiracy is enough to buttress the possession charge.  Based on Pinkerton, I find that it is.

## CONCLUSION

Based on the foregoing, this Court concludes that the evidence presented by the government meets the burden of establishing probable cause that Defendant Gladys Pena committed the offense of possession with intent to distribute a mixture and substance containing over one kilogram of heroin, as charged in the criminal complaint.

ENTER:

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 22, 2014